**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 2, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2025AP167**

Cir. Ct. No.  2023TP9

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO H. M. H., A PERSON UNDER THE AGE OF 18:

WAUKESHA COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,

    PETITIONER-RESPONDENT,

  V.

A. T.,

    RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Waukesha County: CODY J. HORLACHER, Judge. *Affirmed*.

¶1      GROGAN, J.[1]  Amber appeals from an order terminating her parental rights to her six-year-old daughter, Holly.[2]  She argues the circuit court erroneously exercised its discretion at the dispositional phase when it found it was in Holly's best interests to terminate Amber's parental rights.  Specifically, she contends the court failed to sufficiently consider the substantial relationship factor in its analysis as required by WIS. STAT. § 48.426(3).[3]  This court affirms.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  This court uses pseudonyms for all parties identified herein for purposes of confidentiality.  *See* WIS. STAT. RULE 809.19(1)(g).

[3]  WISCONSIN STAT. § 48.426(3) provides that a circuit court "shall consider" the following factors in "considering the best interests of the child":

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

2

## I. BACKGROUND

¶2      Holly was removed from Amber's home[4] when she was two years old due to Amber's substance abuse.[5]  The circuit court found Holly to be a child in need of protection or services and over the course of the next four years, Holly was placed in three different homes.  Initially, Holly was placed with Amber's grandmother, Blanche, who lived across the street.  A year later, Holly's placement was changed to another family member—Amber's cousin.  After realizing that the cousin would not be able to provide the type of care Holly needed, placement was subsequently changed to a non-related foster family, the Rohls, where Holly remained until the County filed the Petition seeking to terminate Amber's parental rights (TPR).

¶3      The TPR Petition alleged two statutory grounds existed warranting termination:  (1) Holly continued to be a child in need of protection or services because Amber failed to satisfy the conditions necessary for Holly to return to Amber's care, *see* WIS. STAT. § 48.415(2);[6] and (2) Amber failed to assume

---

[4] Holly's father, whom Amber represented as her husband, also lived in the home; however, he passed away in November 2021.  Accordingly, this case involves only the termination of Amber's parental rights.

[5] Amber had both drug and alcohol addictions.

[6] WISCONSIN STAT. § 48.415 identifies ten grounds upon which termination of a parent's rights may be found.  As applicable here, subsection (2) provides:

> (2) CONTINUING NEED OF PROTECTION OR SERVICES. Continuing need of protection or services, which shall be established by proving any of the following:

(continued)

parental responsibility since the time Holly was removed from Amber's home in 2020, *see* WIS. STAT. § 48.415(6).[7]  Amber contested the TPR and the grounds

---

(a) 1. That the child has been adjudged to be a child or an unborn child in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363 or 938.365 containing the notice required by s. 48.356 (2) or 938.356 (2).

2. a. In this subdivision, "reasonable effort" means an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child or of the expectant mother or child, the level of cooperation of the parent or expectant mother and other relevant circumstances of the case.

b. That the agency responsible for the care of the child and the family or of the unborn child and expectant mother has made a reasonable effort to provide the services ordered by the court.

3. That the child has been placed outside the home for a cumulative total period of 6 months or longer pursuant to an order listed under subd. 1., not including time spent outside the home as an unborn child; that the parent has failed to meet the conditions established for the safe return of the child to the home; and, if the child has been placed outside the home for less than 15 of the most recent 22 months, that there is a substantial likelihood that the parent will not meet these conditions as of the date on which the child will have been placed outside the home for 15 of the most recent 22 months, not including any period during which the child was a runaway from the out-of-home placement or was residing in a trial reunification home.

[7] WISCONSIN STAT. § 48.415(6) identifies a failure to assume parental responsibility as a ground for termination.  It provides:

(a) Failure to assume parental responsibility, which shall be established by proving that the parent or the person or persons who may be the parent of the child have not had a substantial parental relationship with the child.

(continued)

phase proceeded to a jury trial. The jury returned a unanimous verdict finding both grounds existed to terminate Amber's parental rights. Based on the jury's verdict, the circuit court found Amber unfit and the case proceeded to a dispositional hearing. At the conclusion of that hearing, the court found it was in Holly's best interests to terminate Amber's parental rights and it entered an order to that effect. Amber now appeals.

## II. DISCUSSION

¶4      The sole issue raised on appeal involves a challenge to the circuit court's decision on the best interests of the child after the dispositional hearing. The TPR procedure and this court's standard for reviewing a TPR are well-known and need not be repeated here. *See State v. Shirley E.*, 2006 WI 129, ¶¶26-28, 298 Wis. 2d 1, 724 N.W.2d 623 (explaining the two-step process consisting of the grounds and dispositional phases and standards applicable to each phase); WIS. STAT. §§ 48.415-48.427 (governing TPR procedure); *State v. Margaret H.*, 2000 WI 42, ¶32, 234 Wis. 2d 606, 610 N.W.2d 475. ("An appellate court will sustain the circuit court's ultimate determination in a proceeding to terminate parental rights if there is a proper exercise of discretion.").

---

(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

¶5    This court's review is limited to determining whether the circuit court erroneously exercised its discretion when it found that termination was in Holly's best interests. *See Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152-53, 551 N.W.2d 855 (Ct. App. 1996). This court will not overturn the circuit court's discretionary decision unless it failed to consider the pertinent law, apply the law to the relevant facts, and reach a reasonable determination. *See Margaret H.*, 234 Wis. 2d 606, ¶32. In making the best interests determination at the dispositional phase, the Record must reflect that the circuit court considered and gave weight to each of the six enumerated statutory factors set forth in WIS. STAT. § 48.426(3). *Margaret H.*, 234 Wis. 2d 606, ¶35.

¶6    Amber concedes that the circuit court properly considered five of the six WIS. STAT. § 48.426(3) factors. Her sole challenge is to the consideration and weight the court gave to § 48.426(3)(c)—"Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships."

¶7    Having reviewed the briefs and Record, this court concludes the circuit court adequately considered and weighed the substantial relationships statutory factor when it made its best interests decision. Because full context is necessary to demonstrate the circuit court properly considered the substantial relationships factor, this court sets forth the circuit court's best interests analysis in full, with emphases added to those portions directly relevant to WIS. STAT. § 48.426(3)(c):

> When making a determination on this, the best interest phase, Court is guided by 48.426(3) and the factors laid out there.
>
> I'll start with the easy ones. The likelihood of adoption if TPR is granted. Here, there's unrefuted testimony that

the [foster parents] would be a likely adoptive resource if TPR is to go forward. The duration of separation in this matter is, for all intents and purposes, four years. It's two-thirds of [Holly's] young life.

The more difficult factors, though, that this Court has weighed throughout the duration of not only the case in which *we heard a lot of testimony this week, but also the testimony of the witnesses today, that being the substantial relationship with parent and family and whether or not that would be harmful to sever that legal and emotional relationship with the parent and with the extended family.* We've heard that [Holly] has stayed with her [great-] grandmother, …. with other family members prior to being placed at the placement where she is now with the [foster parents].

She's been with the [foster parents] for the last two years. *We know that both [paternal grandfather] and [great-grandmother] continue to have visits with [Holly] with her foster placement. We do know that [Amber] still remains engaged in attempting visitations. There's been a lot of conversation back and forth about missed visits, about those still being supervised visits, and those only being once a week.*

*We do know that there is a relationship there; that [Amber] is known as mama [Amber]; that [Holly] knows that she is her mom and that she knows her [great-] grandmother and her biological grandfather.* The wishes of the child. That's also been testimony that's kind of a mixed bag. Here, because [Holly] is six years old, for all intents and purposes, she cannot actually speak for herself.

*We do know that she has told the [foster parents] that she's wanted to go home, meaning either with [Amber] or with her [great-] grandmother.* There's some refuted testimony as far as what that is. *We know it's happened a couple of times. But again, [Holly]'s six years old and much like any other six year old that has any type of relationship with their parent, they -- there's an instinctual bond there.*

*It doesn't matter facts of any case that are before you, there's always going to be a parent and child relationship. Doesn't matter how good that relationship is or how poor the surrounding circumstances are.* We do know that [Amber] is in a better place than she's likely been during the pendency of this case. She has, again, for all intents and purposes, worked on her addiction and seems to be,

based off of the UA's, working to overcome that. That's to be commended, right. She's done a lot of good work on that.

She's worked towards that sobriety, virtually on her own, having reached out and trying to do what she could, although certainly there were things, even as she has indicated, she could've did differently, could've done better. She has certainly undergone more trauma in the last decade than a vast majority of people out there. Between family deaths, addiction, and this and likely other traumas that are not in evidence, she is working on herself as she needs to and she should be commended for that.

Ultimately, the determination on this and what this Court needs to rule on in 48.426(3) is not the best interest of parents, but what's in the best interest of the child. Here, it's [Holly]. So what evidence do we have here? The conditions of current placement, likelihood of future placement, results of prior placement.

*We know that [Holly's] had a rocky past. She's been moved from her [great-]grandmother's to a biological cousin's place where she had an accident. I'm sure that caused trauma. Now, she's with the [foster parents] for about the last two years. From all indications, the [foster parents] are a fit and proper placement at this juncture. They've taken care of her. They've tended to her medical and educational needs and emotional.*

*They've brought her in, just as any other member of the family. We know that there's a bond between her and the [foster parents'] other child, that of a brother sister. Maybe not always the most smoothest of relationships, but still, a very familial-like bond. The likelihood of future placements. As what's been testified to and this Court certainly has no reason to refute it, if the TPR is denied, where does [Holly] go?*

*[Holly] likely stays in the foster care system and doesn't realize permanency. We do have [Amber's friend] who took the stand both during the trial and today during the dispositional hearing saying that she could stay with them; however, [Amber's friend] has not been cleared by the department, hasn't seen the department in four years. We don't have any sort of basis to believe that would be in her best interest.*

*[Holly's] moved around a lot in her young life. She needs to find permanency. She needs to know at the end of*

*the day this is where she is.* This is what the structure of her life is. Based off of that, *I do find that the factors do weigh in favor of the termination of parental rights to give [Holly] a more permanent setting based off of the other outlined factors and the evidence that has been presented, the testimony that's been taken regarding the ability for [Holly] to enter into a more permanent and stable living environment and know where she's going to be.*

*The unfortunate thing about this type of hearing is I can't order placement to ensure that relationship between [Holly] and [Amber] continues. It's this Court's sincere hope and desire it does. Unfortunately, it's outside the scope of the law that I'm given to be able to order that. This case is four years in the making, four years worth of upheaval for everybody, but particularly [Holly]*[.]

*She knows, and she's struggling with that.* I sincerely wish her, [Amber] and the [foster parents] all the best going forward in the future and peace that comes with that. *I do find that it is in the best interest, again, to continue on with the termination of parental rights.*

Based off of today's hearing, this Court finds that notice has been given to all those entitled to notice. Provisions of ICWA do not apply. The parents are [Amber and her deceased husband].

There was no declaration of paternal interest. The following grounds for termination of parental rights of [Amber] were found to exist: Continuing need of protection or services, as well as failure to assume parental responsibility. [Amber] had this matter tried to a jury. [Amber] was found unfit based off of the jury's verdict.

*This Court finds that it is in the best interest of the child that the parental rights of [Amber] be terminated, after considering the laid out factors.* Reasonable efforts to achieve the permanency goal for the permanency plan, including through an out-of-state placement, if appropriate, were made by the department or agency responsible for providing services. The child is placed in an adoptive resource home.

*Court makes the finding that the placement of the child in the parental home is contrary to the welfare of the child.* This Court orders that the parental rights of [Amber] are hereby terminated and transferred, pending adoption, to the State of Wisconsin. Information on any appeal shall be

released to the agency who has guardianship of the child.
This is the final order for purposes of appeal.

(Emphases added.)

¶8      This court notes that the law requires that "the record should reflect adequate consideration of and weight to each factor[,]" but there is no required formula as to which factor the circuit court must place the most emphasis. *Margaret H.*, 234 Wis. 2d 606, ¶35. Sometimes factors overlap and intertwine. Here, the Record reflects the circuit court adequately considered each factor.

¶9      As it relates specifically to the issue Amber raises on appeal, the circuit court considered the relationships Holly had with Amber and other family members. While the court's analysis may not have been extensive, it was adequate given the specific factual circumstances of this case. Moreover, this court notes that the statute does not require consideration of *any and all* family relationships the child has, but rather only those that are substantial. *See* WIS. STAT. § 48.426(3)(c). Presumably, this is because the legislature recognized that when considering the best interests of the child, severing *substantial* relationships could be harmful.

¶10     WISCONSIN STAT. § 48.426(3) does not define "substantial relationships." However, a related statute—WIS. STAT. § 48.415(6)(b)—defines a similar phrase, "substantial parental relationship," as "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Although § 48.415(6)(b) applies during the grounds phase rather than the dispositional phase, it is nevertheless instructive in assessing what a substantial relationship looks like under § 48.426(3)(c).

¶11     Amber contends that she had a substantial relationship with Holly from the time of her birth until she was two years old and that she attempted to maintain that relationship during the four years Holly was out of her home. Based on the Record, it does appear that Amber had a substantial relationship with Holly during the first two years of her life. The same cannot be said, however, of the following four years when Holly was placed outside of Amber's home. While Amber may not have had an opportunity to "exercise significant responsibility" for Holly's care during those four years, *see* WIS. STAT. § 48.415(6)(b), she could have taken all steps necessary to attend every single scheduled visit, particularly in 2024, but failed to do so.[8]  For example, the dispositional hearing transcript indicates that at the time of the May 2024 hearing, Amber had already missed seven visits in 2024, the Petition indicates that Amber missed or left approximately one-third of her weekly visits with Holly early during the course of her out-of-home placement, and the Record as a whole reflects that Amber's attendance at those visits was inconsistent and never progressed to more frequent or unsupervised visits.

¶12     Likewise, the Record also reflects that aside from when Holly was placed with her great-grandmother, Amber was generally uninvolved in Holly's medical care, dental care, and therapy and she did not request information about those providers after Holly's placement with her great-grandmother ended.

---

[8] Had Amber consistently attended the supervised visits and met conditions required for return, she could have progressed to more visits or unsupervised visits. The social worker testified that when Holly was living with her great-grandmother just across the street from Amber, visitation was inconsistent and occurred "when it was a convenient time for" Amber "rather than what [Holly] needed." When Holly lived with Amber's cousin, Amber "attended about 50 percent of visits in full[.]"  In the two years Holly has lived with the foster parents, Amber has missed "about one-third of" the visits, not counting the total lack of visits during the months after Amber's husband died.

Amber also had no knowledge of Holly's more recent daycare attendance and did not know the name of Holly's current teacher, and it was only shortly prior to the grounds trial that Amber learned where Holly attended school. The reason Amber gave for not knowing any of this information is that she just did not ask for it. Consequently, the Record clearly supports the conclusion that Amber did not have a substantial relationship with Holly after Holly was removed from her home.

¶13    As for Holly's other family relationships, the Record similarly reflects no *substantial* relationships. At most, Amber brought Holly's half-brothers to the supervised visits once a month, which hardly supports any suggestion that Holly had a *substantial* relationship with them.[9] And, with respect to Holly's great-grandmother, testimony indicated she would have had a substantial relationship with Holly during the year Holly was placed at her home. However, after that placement ended in June 2021, Holly's contact with her great-grandmother was mostly limited to attending visits with Amber after her husband died because Amber wanted her grandmother to come along to help. While the exact dates of those visits are unclear, there was a period of time after Amber's husband passed away that there were no visits, and even once Holly's great-grandmother began attending visits with Amber, she did not attend weekly.

¶14    Having reviewed the Record, it is clear from the facts in this case that the termination of Amber's parental rights did not sever any *substantial* family relationships—the only type of relationship that WIS. STAT. § 48.426(3)(c) requires the circuit court to consider—and as set forth above, the only relationship

---

[9] Amber testified at the grounds hearing that when Holly was placed with her cousin, Holly would also see her half-brothers when the boys were racing go-carts. This, of course, would not have been in the two years preceding the dispositional hearing.

12

that could have arguably fallen into that category (and it did not) would have been with Amber.[10] This court's review therefore confirms that as is statutorily required, the circuit court did consider and weigh the severing of Amber's relationship with Holly as required in ultimately finding that termination would not harm Holly.[11]

¶15 Finally, although the circuit court did not explicitly state that it would not "be harmful to sever" Amber's relationship with Holly, the court's finding is readily discernable from the court's decision. Specifically, the circuit court indicated that without termination, Holly would be left in an indefinite state of impermanency and instability, and it also emphasized that four years was a long time for this six-year-old girl to be in that state. Despite Amber's contention, this case is simply not like *State v. Bolstad*, 2021 WI App 81, 399 Wis. 2d 815, 967 N.W.2d 164, in which this court reversed in a criminal case and remanded for resentencing because there was "nothing in the record" to "discern" that the sentencing court considered one of the three mandatory sentencing factors. *Id.*, ¶¶26-27. In reaching that conclusion, however, we also recognized that courts are not required to use "magic words." *See id.*, ¶¶16, 23 n.7; *see also State v. B.W.*, 2024 WI 28, ¶78, 412 Wis. 2d 364, 8 N.W.3d 22 (requiring circuit courts to make specific statements "would be requiring circuit courts to use 'magic words' to exercise discretion appropriately[,]" which is discouraged).

---

[10] There is nothing that would prevent the circuit court from specifically addressing *other* familial relationships in making its determination; however, the statute requires only a consideration of *substantial* relationships.

[11] Like the circuit court, this court also hopes that Holly's foster parents will follow through with their indicated willingness to continue to allow Amber to have contact with Holly following the termination of Amber's parental rights.

¶16 Unlike in ***Bolstad***, this court *can* discern from the circuit court's decision that it would not be harmful to sever Holly's relationship with Amber. And, as discussed, given the limited and inconsistent contact Amber had with Holly, it would be difficult to identify the relationship as a substantial one. This, combined with all the other statutory factors—particularly the opportunity for Holly to find permanency and stability instead of having to continue to live in a state of uncertainty—confirms there is no basis to reverse. *See **Lofthus v. Lofthus***, 2004 WI App 65, ¶21, 270 Wis. 2d 515, 678 N.W.2d 393 (appellate courts "will search the record for reasons to sustain the trial court's exercise of discretion").

¶17 TPR cases are unquestionably difficult, some more so than others, and it is clear from this Record that *at the time* of the TPR grounds and dispositional hearings, Amber desperately wanted to maintain her parental rights. Her statement to the circuit court at the dispositional hearing genuinely expressed her love for her daughter and her sincere efforts to overcome her personal life traumas and substance abuse problem in order to be able to parent her child. However, the dispositional hearing is not about Amber's best interests but rather it is about Holly's best interests. *See* WIS. STAT. § 48.426(2) ("The best interests of *the child* shall be the prevailing factor considered by the court in determining the disposition of all proceedings under this subchapter." (emphasis added)). Having reviewed the circuit court's decision, the briefs, and the Record, this court concludes the circuit court adequately addressed all six statutory factors, including the only one that Amber challenges in this appeal, and that it therefore properly exercised its discretion when it found that it was in Holly's bests interests to terminate Amber's parental rights.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.